## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NYMBUS, INC., | |
| _Plaintiff / Counter-defendant_, | |
| | |
| v. | |
| | |
| SCOTT SHARP, | No. 3:17-cv-1113 (JAM) |
| _Defendant / Counter-plaintiff,_ | |
| | |
| v. | |
| | |
| HARRY FLOOD, SCOTT KILLOH, | |
| _Third party defendants._ | |

## RULING RE MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS
## AND MOTION FOR PARTIAL SUMMARY JUDGMENT

This is a case about a business employment dispute. Nymbus, Inc. is a software

development company that hired Scott Sharp as its chief operating officer. Their relationship fell

apart for hotly disputed reasons, and they have sued one another. Now before me are two

motions by Sharp for partial judgment on the pleadings and partial summary judgment. I will

deny the motion for partial judgment on the pleadings and grant the motion for partial summary

judgment.

### BACKGROUND

The following facts are drawn from the complaint except as noted. Doc. #1; _see also_

_Nymbus, Inc. v. Sharp_, 2018 WL 705003 (D. Conn. 2018). Nymbus, Inc. is a software company

that is incorporated in Delaware and headquartered in Florida. Around January 2015, Nymbus

began working on a new core processing platform for financial institutions such as community

banks and credit unions. To aid the development of this new platform, Nymbus purchased in

January 2016 another core processing platform known as Sharp BancSystems from a group of banks that was owned in part by Scott Sharp and his family.

Along with this acquisition of Sharp BancSystems, Nymbus hired Sharp to serve as its chief operating officer. His agreed-upon annual salary started at $250,000 and rose to $300,000. According to Nymbus, it hired Sharp because of Sharp's representations that he had extensive experience in designing, developing, operating, and converting a core processing platform. The parties entered into an employment agreement that has been made an integral part of the record in this case. Doc. #2.

Sharp's primary responsibilities as chief operating officer for Nymbus included: (i) advancing the design and development of Nymbus's state of the art core processing platform, including the feature and functionality of its products; (ii) designing and developing a conversion and implementation process for financial institutions that purchased the Nymbus core processing platform, and (iii) ensuring that the Sharp BancSystems business now owned by Nymbus was in full compliance with all applicable banking and data security regulations.

According to the complaint, however, Sharp materially failed to carry out each of these responsibilities. He failed to advance the design and development of the features and functionality required for Nymbus's platform, while failing as well to advance the platform so that it met its federally mandated compliance obligations. In addition, he failed to design and develop a conversion and implementation process for financial institutions that purchased the Nymbus platform. He also failed to ensure that the Sharp BancSystems business met its federally mandated compliance obligations, and he failed to implement and maintain adequate and sufficient operational and data security measures at one or more of Sharp BancSystems's facilities.

The complaint does not merely allege that Sharp failed to do his job but that he breached his fiduciary duty to Nymbus in two ways. First, he failed to disclose to Nymbus that the Sharp BancSystems business suffered from one or more material operating and compliance weaknesses. Second, he had an ongoing conflict of interest because of his continuing position with one or more of the Sharp family banks.

On April 12, 2017, Nymbus placed Sharp on paid administrative leave. The undisputed record beyond the complaint includes two letters from Nymbus to Sharp in April 2017 advising him that he was being placed on paid administrative leave pending an investigation of his actions as a Nymbus employee and advising that while on leave he must refrain (1) from communicating with any Nymbus employees, customers, and potential customers of Nymbus; (2) from conducting any Nymbus business; and (3) from accessing any Nymbus systems and facilities. Doc. #57 at 37–38.

A little more than two months later, Sharp notified Nymbus on June 16, 2017, that he was leaving his position, providing a "Notice of Termination of Employment with Good Reason." He sought to avail himself of a provision of his employment agreement allowing him to terminate his employment for "good reason," which is defined in relevant part to include "the occurrence of . . . (iv) a material, adverse change in the Executive's authority, duties or responsibilities (other than temporarily while the Executive is physically or mentally incapacitated or as required by applicable law)." Doc. #2 at 7 (§ 5.1(c)).

Nymbus responded on July 5, 2017, by sending Sharp a "Notice of Termination of Employment for Cause," as well as by filing the complaint in this action. Doc. #1. The Nymbus complaint against Sharp alleges the following three claims: breach of fiduciary duty (Count 1), breach of contract (Count 2), and declaratory judgment (Count 3) regarding whether Nymbus

had "good cause" to terminate Sharp or, alternatively, whether Sharp had "good reason" to

terminate his employment (a distinction that matters to whether Sharp is entitled to certain

additional payments from Nymbus).

Sharp has answered the complaint to dispute Nymbus's claims of Sharp's wrongful

conduct and in turn to allege 12 counterclaims against Nymbus as well as third-party claims

against two Nymbus executives. Doc. #51. Insofar as is relevant to the motions now before me,

four of Sharp's counterclaims (Counterclaims 1 through 4) are based on Nymbus's alleged

failure to pay Sharp compensation for three months in 2016, and two of the counterclaims

(Counterclaims 11 and 12) are based on allegations that Sharp resigned for "good reason,"

resulting in his entitlement to certain post-termination compensation.

Now before me are two motions filed by Sharp. The first is a motion for partial judgment

on the pleadings to dismiss Nymbus's claims for breach of contract and for breach of fiduciary

duty. The second is a motion for partial summary judgment contending that the Court should

grant judgment in his favor on two specific issues: (1) that his employment was not exempt from

the Fair Labor Standards Act for at least the three months that Nymbus failed to pay his salary,

and (2) that he had "good reason" as defined under the employment agreement to resign from his

employment with Nymbus.

**DISCUSSION**

I will address Sharp's motion for partial judgment on the pleadings before turning to his

motion for partial summary judgment.

### A. *Motion for judgment on the pleadings*

The principles that govern a motion for judgment on the pleadings pursuant to Fed. R.

Civ. P. 12(c) are well established. The Court must accept as true all factual matters alleged in a

complaint and draw all reasonable inferences in favor of the non-moving party, although a complaint may not survive unless the facts it recites are enough to state plausible grounds for relief. *See, e.g.*, *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018).

### 1. *Breach of contract*

The parties agree that Texas law governs the terms of the employment contract. Under Texas law, a "plaintiff asserting a breach-of-contract claim must prove (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach." *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n. 21 (Tex. 2018).

Sharp alleges that Nymbus failed to satisfy the third element of a breach of contract claim (that defendant breached the contract) because all of the allegations of the complaint are conclusory, and "even if they could be considered factual allegations . . . these allegations would merely allege that Nymbus was unsuccessful within the sphere of Mr. Sharp's alleged areas of responsibility." Doc. #67 at 15. I do not agree with Sharp's arguments.

To begin with, the complaint cites a provision of the contract prohibiting Sharp from engaging in non-Nymbus business activity that would conflict or interfere with his performance of his Nymbus job responsibilities. Doc. #1 at 7 (¶ 43) (citing § 2.2 of the employment agreement). The complaint goes on to allege that Sharp dedicated a substantial portion of his time and attention to serving as a director of the Sharp family banks without receiving the required consent from Nymbus or disclosing his activities to Nymbus.

These allegations are sufficient to plausibly establish a claim for breach of contract. "[B]reach of contract claims fall under [Fed. R. Civ. P.] Rule 8(a), and thus require only a 'short

and plain statement of the claim,' so long as the facts alleged and any reasonable inferences that can be drawn in [plaintiff's] favor give rise to a plausible claim for relief." *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 64 (2d Cir. 2012).

The parties' employment contract also provides that Sharp would have duties, authority, and responsibility as determined by the Nymbus chief executive officer (Doc. #2 at 3 (§ 2.1)), and the complaint in turn enumerates specific failures by Sharp within the scope of his assigned responsibilities (Doc. #1 at 8 (¶ 47)). For initial pleading purposes, these allegations suffice to plausibly suggest that Sharp materially breached the contract by failing to carry out the responsibilities for which he was hired.

Sharp additionally alleges that the complaint fails to sufficiently plead an injury from his breach of contract. I do not agree. In view of the multiple allegations about Sharp's across-the-board failure to carry out his duties as a high corporate officer, it is readily plausible that there was an injury to Nymbus and in excess of the federal jurisdictional minimum of $75,000 as Nymbus alleges in the complaint. Accordingly, I will deny the motion for judgment on the pleadings with respect to Nymbus's breach of contract claim.

### 2. *Breach of fiduciary duty*

As to Nymbus's breach of fiduciary duty claim, the parties do not agree on which state's law applies. Sharp argues that Texas law applies because the employment agreement provides that "[t]his Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction)." Doc. #2 at 21. By contrast, Nymbus argues that the agreement's choice-of-law clause only applies to contract disputes rather than tort

disputes, and that Delaware law applies to a dispute about a breach of fiduciary duty between a Delaware company and one of its officers. Doc. #73 at 13.

To determine what law applies to a given dispute, "a federal court sitting in diversity must apply the conflict-of-laws rules of the state in which the federal court sits." *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002). Connecticut courts give effect to contractual choice-of-law provisions but distinguish between a *narrow* choice-of-law provision that purports to govern solely a dispute arising from the parties' contract and a *broad* choice-of-law provision that purports to choose the law that shall apply to any dispute whatsoever that might arise between the parties. *See Motiva Enterprises, LLC v. W.F. Shuck Petroleum*, 2012 WL 601245, at *8 (D. Conn. 2012); *U.S. Fidelity and Guar. Co. v. S.B. Phillips Co*., 359 F. Supp. 2d 189, 205 (D. Conn. 2005); *see also W. Dermatology Consultants, P.C. v. VitalWorks, Inc*., 322 Conn. 541, 561 (2016) (declining to apply contractual choice-of-law provision to tort claim where provision "expressly limited the application of Connecticut law to the construction and interpretation of the contract itself").

I view the Nymbus/Sharp contractual choice-of-law provision as a narrow one. It is restricted to disputes that arise under the agreement itself, and so it does not dictate the law that applies to Nymbus's tort claim for breach of fiduciary duty. *See, e.g.*, *Aviamax Aviation Ltd. v. Bombardier Aerospace Corp*., 2010 WL 1882316, at *4 (D. Conn. 2010) ("Although the tort claims may be closely related to the subject of the contract, this relatedness is not sufficient to make the choice of law provision applicable in the tort context.") (internal quotations omitted).

In view that the parties' choice-of-law clause does not require the application of Texas law to the breach of fiduciary claim, I must consider what law governs under background choice-of-law principles in Connecticut. The "default rule" in Connecticut is that "the law of the state of

incorporation normally determines issues relating to the internal affairs of a corporation because application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation." *NatTel, LLC v. SAC Capital Advisors LLC*, 370 F. App'x 132, 134 (2d Cir. 2006) (internal citations and quotations omitted); *Godina v. Resinall Int'l, Inc.*, 677 F. Supp. 2d 560, 569 (D. Conn. 2009) (same). Under this rule—known as the internal affairs doctrine—Delaware law governs Nymbus's breach of fiduciary duty claim because Sharp was an officer of Nymbus, which is incorporated in Delaware.

Sharp alleges that the complaint does not adequately allege a breach of fiduciary duty. The elements of a claim for breach of fiduciary duty under Delaware law are that a fiduciary duty exists and that a fiduciary breached that duty. *See Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. 2002), *aff'd*, 806 A.2d 164 (Del. 2002). Sharp does not dispute that he owed a fiduciary duty to Nymbus as its chief operating officer. *See Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009) (corporate officers owe a fiduciary duty of care and loyalty). Sharp instead solely contests the adequacy of allegations to suggest that he breached his fiduciary duty.

In my view, the complaint adequately alleges facts to plausibly suggest a breach of fiduciary duty. For example, Nymbus alleges a long list of failures by Sharp in carrying out his job responsibilities (Doc. #1 at 5–6 (¶¶ 34–36)) and then further alleges that these failures were the product of a conflict of interest relating to his separate interests in the Sharp banks (*id.* at 6 (¶¶ 37–39)). These allegations of divided loyalties are enough to sustain a breach of fiduciary claim at the pleading stage.

Sharp next alleges that the so-called "business judgment" rule defeats Nymbus's breach of fiduciary duty claim. "In Delaware, the business judgment rule is a presumption that directors

act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company." *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005). "A plaintiff may overcome the presumption that directors and officers acted in good faith by establishing that a decision was so egregious as to constitute corporate waste. The burden here is to show irrationality: a plaintiff must demonstrate that no reasonable business person could possibly authorize the action in good faith." *Ibid.* (internal quotations and citations omitted).

Delaware courts regularly apply the business judgment rule to corporate directors. *See, e.g.*, *Gantler*, 965 A.2d at 706. But Delaware courts have yet to resolve whether the rule applies to corporate officers like Sharp. *See, e.g.*, *Marchland v. Barnhill*, 2018 WL 4657159, at *13 (Del. Ch. 2018); *Palmer v. Reali*, 211 F. Supp. 3d 655, 666 n.8 (D. Del. 2016).

For the time being, I don't need to predict how the Delaware Supreme Court will ultimately resolve this issue, because I conclude that the allegations of the complaint are enough—if barely—to plausibly suggest that Sharp's conduct would not be protected under the business judgment rule even if the rule applies to the claim against him in this case. If Sharp failed across the board to carry out his high-level corporate responsibilities because of a conflict of interest, this suggests bad faith conduct well outside the scope of any discretionary business judgment that the business judgment rule is designed to protect.[1] Accordingly, I will deny the motion for judgment on the pleadings with respect to Nymbus's breach of fiduciary duty claims.

---

[1] I am mindful that counsel for Nymbus stated at oral argument that the company did not plead around the business judgment rule. Doc. #101 at 23. My task, however, is to make an independent determination of whether the allegations of the complaint are sufficient. Of course, the fact that the allegations of the complaint may be sufficient for now to surmount the business judgment rule does not mean that Sharp may not renew his challenge under the business judgment rule at a later stage of the litigation and in light of a discovery record.

### B.   *Motion for partial summary judgment*

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve closely contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

Sharp has moved for summary judgment on two issues: the applicability of the Fair Labor Standards Act (FLSA) to his job with Nymbus, and whether he had "good reason" (as that term is defined in his employment contract) to resign from the job. As a threshold matter, Nymbus argues that the Court should not rule on a partial motion for summary judgment. But a plain reading of the applicable rule makes clear that a party may move for summary judgment on less than the whole case. "A party may move for summary judgment, identifying each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added).

### 1.   *Applicability of the FLSA exemption*

Sharp seeks summary judgment on the issue of whether he was exempt from protections of the Fair Labor Standards Act. Congress enacted the Fair Labor Standards Act to correct adverse labor conditions harmful to the minimum standard of living necessary for health,

efficiency, and general well-being of workers. *See Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 227 (2d Cir. 2018). To that end, the FLSA imposes substantive wage, hour, and overtime standards, including requirements for the payment of a minimum wage and for time-and-a-half overtime pay for hours worked in excess of 40 hours during a week. *Ibid.* The FLSA is subject to certain exemptions, and it is the employer who bears the burden of proving that an employee falls within one of the FLSA's exemptions. *Ibid.*

The FLSA exempts "any employee employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1). The Secretary of Labor has in turn defined an executive employee in terms of job responsibilities and salary. *See* 29 C.F.R. § 541.100. Nymbus and Sharp do not dispute that Sharp's job responsibilities are among those contemplated by the exception. The focus of their dispute is on the salary portion of the test. To qualify as an exempt executive, "an employee must be compensated on a salary basis at a rate per week of not less than the 40th percentile of weekly earnings of full-time nonhourly workers in the lowest-wage Census Region." *Id.* § 541.600. That number was $455 per week when Sharp signed his employment agreement, 29 C.F.R. § 541.100 (2004) (setting a weekly sum that was next updated in 2016), and increased to $913 per week as of December 1, 2016, 29 C.F.R. § 541.607 (2016).

Compensation on a "salary basis" means, in relevant part, that an employee is not paid an hourly wage but instead "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." *Id.* § 541.602(a). Subject to certain exceptions, "an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or

hours worked." *Id.* § 541.602(a)(1). But "[e]xempt employees need not be paid for any workweek in which they perform no work." *Ibid.*

Sharp's annual salary of between $250,000 and $300,000 during his tenure with Nymbus well exceeds the gross amount necessary to qualify him for the executive exemption. Doc. #34 at 15–16. The question, however, is whether the *way* in which Sharp was paid—or not paid—means that he was "compensated on a salary basis" as defined by the regulation. Sharp argues that the FLSA exemption does not apply to him because Nymbus failed intermittently to pay him for three of the months he worked in 2016: July, August, and December. He argues that his pay was therefore not "regularly receive[d] each pay period" and that he did not receive a "full salary for every week in which [he] perform[ed] any work," as required by § 541.602(a).

Nymbus counters that, while Sharp has not yet been paid for three months of 2016, his "employment agreement called for him to receive an annual salary which, if spread out over 52 weeks, would pay him well above the amounts required by the highly compensated employee exemption." Doc. #65 at 17. Maybe so, but the regulation makes clear that the annual salary alone is not dispositive, and factors such as the timing of payment are also relevant. Moreover, the key inquiry is not what the employment agreement stated that he should be paid but what he was actually paid. *See Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 848 (6th Cir. 2012) (the "question is therefore not what [the employee] was owed under his employment agreement; rather, the question is what compensation [the employee] actually received").

Because there is no dispute that Sharp was not paid at all for three months of his work for Nymbus, it cannot be said he "regularly receive[d]" his salary as the regulation requires (or as his employment agreement provided as to salary payments not less frequently than once per month, (Doc. #2 at 8)). Accordingly, at least for those three months when Sharp was not paid in July,

August, and December 2016, I conclude that Sharp's employment was not exempt from the protections of the FLSA and will grant summary judgment in Sharp's favor on this issue.

### 2. *Good reason to terminate employment*

Sharp next seeks summary judgment on the issue of whether he had "good reason" to terminate his employment with Nymbus. As noted above, "good reason" as defined by the contract "mean[s] the occurrence of any of the following . . . (iv) a material, adverse change in the Executive's authority, duties or responsibilities (other than temporarily while the Executive is physically or mentally incapacitated or as required by applicable law)." Doc. #2 at 7 (§ 5(1)(c)). In a letter to Sharp dated April 11, 2017, Nymbus stated that "[f]or the time being, we ask that you refrain from accessing any Nymbus systems and facilities. We further ask that you refrain from conducting any Nymbus business." Doc. #57 at 37. A subsequent letter dated April 21, 2017, reiterated these conditions in stronger and more specific terms. *Id.* at 38. Sharp alleges that these changes in his status were material and adverse, and as such, that his decision to terminate satisfies the definition of good cause set out in the contract.

In support of its position that Sharp did not have "good reason" to resign, Nymbus cites cases finding or suggesting that being placed on a paid administrative leave is not an adverse employment action. *See, e.g.*, *Esparza v. Univ. of Texas at El Paso,* 471 S.W.3d 903, 910 (Tex. App. 2015) (collecting cases) (noting that "the federal courts have consistently held that suspensions with pay are not adverse employment actions"); *Breaux v. City of Garland,* 205 F.3d 150, 158 (5th Cir. 2000) (finding that an employee placed on paid administrative leave and later reinstated to his original position did not suffer an adverse employment action).

But these cases do not control. "Good reason" as defined in the parties' contract does not hinge on how Texas courts interpret the term "adverse employment decision," which is a term of

13

art most commonly used in cases about employment discrimination. In contrast, Sharp's employment contract uses the terms "material" and "adverse" as an adjective to modify "changes," and the meaning of "material, adverse changes" in this context is not ambiguous. Doc. #2 at 7. Merriam-Webster Dictionary defines "adverse" as "opposed to one's interests" or "causing harm." *Adverse*, MERRIAM-WEBSTER DICTIONARY (Feb. 2019, https://www.merriam-webster.com/dictionary/adverse). Losing the authority to access Nymbus facilities and communicate with Nymbus employees meets this definition. Any reasonable executive would consider being stripped of most or all of his authority an adverse and material change.

Nor does the contract the parties bargained for contain an exception to the "good reason" for changes in authority due to the employee being placed on administrative leave and/or under investigation. Except where the executive is physically or mentally incapacitated, or where the changes are required by applicable law—the only exceptions provided for in this section of the contract—resignation based on "a material, adverse change" in the executive's authority constitutes resignation for good reason. Doc. #2 at 7. Sharp was subject to such a material, adverse change in his employment, and therefore I will grant summary judgment in Sharp's favor on the issue of whether he had good reason to terminate his employment with Nymbus.[2]

## CONCLUSION

For the foregoing reasons, Sharp's motion for judgment on the pleadings (Doc. #66) as to Nymbus's claims for breach of contract and breach of fiduciary duty is DENIED, and Sharp's

---

[2] The parties' employment contract also provides that "the Executive cannot terminate his employment for Good Reason unless he has provided written notice to the Company of the existence of the circumstances providing grounds for termination for Good Reason and the Company has had at least fifteen (15) days from the date on which such notice is provided to cure such circumstances." Doc. #2 at 7. Nymbus has not alleged any facts to suggest that this condition was not met.

motion for partial summary judgment (Doc. #56) on the issues of his non-exemption under the

FLSA and his "good reason" for terminating his employment is GRANTED.

It is so ordered.

Dated at New Haven this 19th day of February 2019.

/s/ ***Jeffrey Alker Meyer***
Jeffrey Alker Meyer
United States District Judge